UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD E. BELLAMY,

                              Plaintiff,

          v.

MICHAEL J. ASTRUE, Commissioner of
 Social Security,

                              Defendant.
_____

**REPORT**
**and**
**RECOMMENDATION**

**08-CV-0628A**

APPEARANCES:         LAW OFFICES OF KENNETH R. HILLER
                     Attorneys for Plaintiff
                     AMANDA R. JORDAN, of Counsel
                     6000 North Bailey Avenue
                     Suite 1A
                     Amherst, New York 14226

                     KATHLEEN M. MEHLTRETTER
                     Acting United States Attorney
                     Attorney for Defendant
                     JANE B. WOLFE,
                     Assistant United States Attorney, of Counsel
                     Federal Centre
                     138 Delaware Avenue
                     Buffalo, New York 14202

## <u>JURISDICTION</u>

          This action was referred to the undersigned by Honorable Richard J. Arcara on

October 29, 2008.  The matter is presently before the court on motions for judgment on

the pleadings filed on March 23, 2009 by Defendant (Doc. No. 12), and May 27, 2009

by Plaintiff (Doc. No. 14).

## BACKGROUND

Plaintiff Ronald E. Bellamy ("Plaintiff"), seeks review of Defendant's decision denying him Social Security Disability Insurance benefits ("SSDI"), and Supplemental Security Income ("SSI") (together, "disability benefits") under, respectively, Titles II and XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined Plaintiff has the severe impairments of post-stroke cognitive disorder and sarcoidosis[1] (R. 10)[2], but does not have an impairment or combination of impairments within the Act's definition of impairment. *Id*. Defendant further determined Plaintiff had the residual functional capacity to perform light work with the following additional limitations: (1) simple, routine work; (2) word recognition at the sixth grade level; (3) math at the fifth grade level; (4) spelling at the third grade level, and that Plaintiff's alleged symptoms and resulting functional limitations were not credible. (R.15). As such, Plaintiff was found not disabled, as defined in the Act, at any time from the alleged onset date through the date of the Administrative Law Judge's decision. *Id*.

## PROCEDURAL HISTORY

Plaintiff's applications for disability benefits, filed on August 17, 2006, (R. 97-111) were initially denied by Defendant on February 27, 2007. (R. 51-54). Pursuant to Plaintiff's request, filed March 31, 2007 (R. 58), a hearing was held before an

---

[1]Sarcoidosis is an inflammatory condition causing lumps of cells to accumulate in the internal organs including the lungs, liver, brain, eyes, and heart. Symptoms may include shortness of breath, fatigue, weight loss, weakness, and low grade fever. *See* The Merck Manual Online Medical Library, *available at* http://www.merck.com/mmpe/sec05/ch056/ch056a.html.

[2]"R._" references are to the page numbers of the Administrative Record submitted in this case.

Administrative Law Judge ("the ALJ") on January 3, 2008, in Buffalo, New York. The Plaintiff, represented by Paul M. Pochepan, Esq. (R. 30-39)[3] appeared at the hearing. Testimony was also given by vocational expert Peter A. Manzi ("Manzi") ("the VE"). (R. 45-49). The ALJ's decision denying the claim was rendered on February 14, 2008. (R. 7-18).

On February 27, 2008, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 26-27). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on July 22, 2008. (R. 1-3). This action followed on August 21, 2008, with Plaintiff alleging the ALJ erred by failing to consider him disabled as of July 18, 2006. (Doc. No. 1).

Defendant's answer, filed October 27, 2008 (Doc. No. 3), was accompanied by the record of the administrative proceedings. On March 23, 2009, Defendant filed a motion for judgment on the pleadings ("Defendant's motion"), accompanied by a memorandum of law (Doc. No. 13) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings ("Plaintiff's motion") on May 27, 2009, accompanied by a supporting memorandum of law (Doc. No. 14) ("Plaintiff's Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DENIED; Plaintiff's motion should be DISMISSED without prejudice, and the matter should be REMANDED for an expedited further hearing and decision.

---

[3] The transcript incorrectly spells Mr. Pochepan's name as "Cochigan." (R. 56-57).

## **FACTS**[4]

Plaintiff, Ronald E. Bellamy ("Plaintiff"), was born on May 27, 1962, has a high school education, is married, and lives with two of his four grown children. (R. 32-33). Plaintiff's previous work experience includes a school bus driver from January 2003 through September 2005, a delivery truck driver from November 2003 through November 2005, and a factory machinist from March 1991 through May 2003. (R. 123). Most recently, Plaintiff worked as a painter from June 2006 until July 2006 when he suffered a stroke. (R. 25).

Plaintiff sought treatment for his stroke on July 19, 2006, from Strong Memorial Hospital, complaining of dizziness, significant gait instability, nausea, double vision, headache, left facial numbness, and decreased sensation of his right side. (R. 225-36). On July 21, 2006, Robert C. Griggs, M.D. ("Dr. Griggs"), ordered Magnetic Resonance Imaging ("MRI") that suggested a lateral medullary (brainstem) stroke, and Magnetic Resonance Angiography ("MRA") that revealed slightly inadequate opacification (opaqueness) of the posterolateral wall of Plaintiff's left vertebral artery raising the possibility of a small, focal dissection (elevation or separation of the lining of the vertebral artery)(R. 345). A chest X-ray ordered by Dr. Griggs on July 21, 2006, showed normal results. (R. 343).

On July 27, 2006, Plaintiff presented to Joseph P. Cronin, M.D. ("Dr. Cronin"), with complaints of left facial tingling and numbness, left finger tingling, vertigo, decreased coordination, bruising and swelling of the groin, and a "jumpy" left eye. (R.

---

[4]Taken from the pleadings and the administrative record.

346). Upon examination on August 4, 2006, Physical Therapist Julie Nitto Styn ("PT Nitto Styn") evaluated Plaintiff as exhibiting shuffling of the left foot with lack of heel strike and toe off, decreased knee flexion bilaterally, significant decreased ambulatory speed, and the inability to balance or stand on one foot without upper extremity support. (R. 271). PT Nitto Styn evaluated Plaintiff's left hip flexion and strength as 4-/5; knee extension 4/5; glut medius 3/5; glut maximus 3/5; and abdominals 3+/5. *Id*. Plaintiff attended three sessions of physical therapy on August 1, 2006, August 4, 2006, and August 9, 2006. (R. 274-75).

A liver ultrasound on August 7, 2006, ordered by Dr. Cronin, showed mild fatty infiltration of Plaintiff's liver parenchyma (tissue substance). (R. 342).

Plaintiff sought treatment at Millard Fillmore Gates Hospital Emergency Room on August 11, 2006, for complaints of left sided head pressure, where a computerized tomography ("head CT") showed normal results. (R. 257-260). A follow-up brain MRI by Krishna Kartha, M.D. ("Dr. Kartha") on August 14, 2006, revealed a very small focus of increased signal within Plaintiff's left lateral medulla (brainstem tail), a finding Dr. Kartha opined "would be highly consistent with a small lacune [cerebrospinal fluid ("CSF") filled cavity in the brain's white matter, a component of the central nervous system] which had actually been acute [during Plaintiff's July 19, 2006 and July 21, 2006 MRI and MRA tests] and is now late subacute." (R. 340-41)(bracketed material added)[5].  On August 15, 2006, Petra S. Lehning, M.D. ("Dr. Lehning") diagnosed Plaintiff with left facial nerve paralysis and sinusitis, and referred Plaintiff to neurologist Vernice E.

---

[5]Unless indicated otherwise all material in brackets is added.

Bates, M.D. ("Dr. Bates"). (R. 337).

After reviewing Plaintiff's medical history, Dr. Bates confirmed Plaintiff's August 14, 2006 MRI contained "findings suggestive of lateral medullary syndrome [disease that results in difficulty swallowing, speaking, or both]," and noted Plaintiff experienced "new weakness involving his left face." (R. 425-26). Dr. Bates opined Plaintiff exhibited "very limited deficits, presently consistent only of left VII nerve palsy [dysfunction of the seventh cranial nerve resulting in an inability to control facial muscles on the affected side]" and exhibited no aphasia[6] (inability to communicate). *Id.* A subsequent examination by Dr. Bates on August 24, 2006, showed Plaintiff experiencing severe facial weakness and severe left VII facial nerve[7] palsy. (R. 407). Dr. Bates diagnosed that Plaintiff exhibited no aphasia, and was able to recall three of three test objects at five minutes on formal memory testing. (R. 406).

A liver biopsy performed by Samuel Goodloe Jr., M.D. ("Dr. Goodloe") on August 22, 2006, showed Plaintiff with multiple non-caseating epitheloid granulomas (ball-like collections of immune cells) consistent with sarcoidosis. (R. 488). A sonographic liver examination on August 28, 2006, showed normal results. (R. 336). Plaintiff's blood laboratory results on September 5, 2006, showed increased levels of angiotensin-converting enzyme ("ACE")(enzyme that causes blood vessels to constrict)[8] and

---

[6]Aphasia is categorized into four broad categories including, expressive, receptive, anomic, and global. *See* http://www.ninds.nih.gov/disorders/aphasia/aphasia.htm.

[7]The facial nerve is the seventh nerve of twelve paired cranial nerves. http://www.medicinenet.com/facial_nerve_problems/article.net.htm.

[8]Typical adult ACE levels are less than 40 micrograms/L. Plaintiff's September 5, 2006 ACE test results were 82 micrograms/L. http://nlm.nih.gov/medicineplus/ency/article/003567.htm.

eosinophils (a type of white blood cell). (R. 391).

On September 22, 2006, Plaintiff visited David J. Rodman, M.D. ("Dr. Rodman"), an ophthalmologist, complaining of pain, pressure, and irritation in both eyes, and an inability to close his left eye. (R. 389). During an examination by Dr. Bates on September 28, 2006, Plaintiff exhibited prominent new weakness involving his right face, almost no movement below eye level, a weakened ability to close his eyes, decreased corrugators (eyebrow muscle) on his left side, and right and left sided nerve palsy, prompting Dr. Bates to recommend a head MRI to detect any abnormalities in Plaintiff's posterior fossa (area of the brain containing the brainstem and cerebellum) and to support Dr. Rodman's diagnosis of sarcoidosis. (R. 404). Dr. Bates opined concern about the initial diagnosis of a stroke and the left vetebral dissection

> From the description of the cerebral angiogram, it was at most partial and there was a subtle lesion in his medulla. Given the clearing of his symptoms and now the new 7th nerve palsy on the right, I am now suspicious that the sarcoidosis if established may account for all his symptoms.

(R. 405).

A chest X-ray performed on September 30, 2006, revealed bilateral hilar adenopathy (disease of the lympth node) compatible with pulmonary sarcoidosis. (R. 334-45). A skin survey that day performed by Carla Fredrick, M.D. ("Dr. Fredrick"), showed small dry papules (circumscribed solid elevations of the skin) over Plaintiff's trunk. (R. 332).

Psychologist Thomas Ryan, Ph.D. ("Dr. Ryan"), conducted a consultative organicity evaluation of Plaintiff on October 5, 2006, evaluating Plaintiff with difficulty learning new or complex tasks, little or no ability to maintain short-term concentration

and attention, potential problems dealing with stress, and the inability to maintain a regular schedule. (R. 318). Dr. Ryan's organicity examination included administration of the Wechsler Adult Intelligence Scale ("WAIS III") (a standardized intelligence test). Dr. Ryan opined Plaintiff's Hutt-Briskin score (quantitative numerical test of motor-vision coordination) of five indicated significant organic deficit in Plaintiff's perceptual-motor integrative functioning, that Plaintiff's working memory recall was limited to five digits forward and three backward, and that Plaintiff's results were "consistent with psychiatric problems which may interfere to some degree on a daily basis." (R. 318-319). Dr. Ryan further opined that Plaintiff's full scale IQ (measured at 75), placed Plaintiff's functioning in the "borderline range," and that Plaintiff suffered a "cognitive disorder, NOS, subsequent to cerebrovascular accident," noting his prognosis was "guarded given the overall nature of his condition." *Id*.

A consultative examination performed by Fenwei Meng, M.D. ("Dr. Meng") on October 5, 2006, showed Plaintiff exhibited no limitations of speech or hearing, and "mild to moderate limitations with walking, standing, and going up and down stairs, mainly due to equilibrium problems after his stroke." (R. 315). On October 6, 2006, during a consultative ophthalmic examination by Theodore P. Prawak, M.D. ("Dr. Prawak"), Plaintiff's symptoms included sharp pains in his left eye and head, headache, unsteady gait, and sinus drainage. (R. 320-22). An MRI performed by Ronald Alberico, M.D. ("Dr. Alberico") on October 12, 2006, revealed

> abnormal enhancement associated with the right internal auditory canal apex extending into the right geniculate region . . . [a] pattern [which] could be associated with sarcoidosis or simply inflammatory process of the seventh nerve complex bilaterally.

8

(R. 403).

Dr. Alberico opined the "enhancement associated with the apex of the internal auditory canal bilaterally, more prominent on the right than on the left, . . . could conceivably be related to [Plaintiff's] known sarcoidosis." *Id*.

Plaintiff returned to Dr. Cronin on October 16, 2006, complaining of increased left-sided headache pain, leading Dr. Cronin to opine "given Plaintiff's bilateral VII nerve palsy and increased ACE level, sarcoidosis [was] virtually confirmed." (R. 328). A subsequent visit to Dr. Cronin on November 13, 2006, showed Plaintiff experiencing sharp pain and tingling around his left face and eye. (R. 446).

On November 16, 2006, Hillary Earl Tzetzo, M.D. ("Dr. Tzetzo"), a state agency psychiatrist, conducted a consultative psychiatric evaluation of Plaintiff's medical disposition under Section 12.02 (organic mental disorders) of Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments"). (R. 356). Dr. Tzetzo opined Plaintiff's medical disposition required a residual functional assessment and that his coexisting nonmental impairment required referral to "another medical specialty." *Id*. Dr. Tzetzo classified Plaintiff's residual functional limitations as "moderate" with restrictions of activities of daily living, "mild" with respect to maintaining social functioning, "moderate" with respect to maintaining concentration, persistence or pace, and noted Plaintiff suffered one or two episodes of deterioration of extended duration. (R. 366). Dr. Tzetzo opined Plaintiff's possessed some limitations as a result of his cerebral vascular accident including difficulty learning new tasks and performing complex tasks, and noted Plaintiff's previous Bender visual motor gestalt test results were not normal "which would seemingly support [Plaintiff's] alleged memory problems," but, that

Plaintiff's memory impairment and loss of measured intellectual ability did not "precisely" satisfy the diagnostic criteria of Section 12.02 (organic mental disorders) of the Act. (R. 357-68).

On November 21, 2006, Plaintiff returned to Dr. Bates with reduced pain and "almost normal" facial weakness. Dr. Bates noted the small lesion of Plaintiff's left medulla represented a small stroke, and diagnosed Plaintiff with "neurosarcoidosis manifested by two episodes of 7th nerve palsy, one on the left and one on the right." (R. 401-02). Dr. Bates noted Plaintiff recalled three of three test objects at five minutes on formal memory testing and exhibited no aphasia. *Id*. Plaintiff visited James G. Corasanti, M.D., PhD. ("Dr. Corasanti") on December 3, 2006, for a gastroenterological evaluation, complaining of facial twitching and temporal arteritis (inflammatory disease of the blood vessels of the head), when his prednisone dose was decreased to 20 mg from 60mg. (R. 370). Dr. Corasanti diagnosed Plaintiff with sarcoidosis affecting liver parenchyma (essential function), and noted Plaintiff's sarcoidosis was the likely cause of his previously elevated blood triglycerides and cholesterol levels. *Id*.

Plaintiff sought treatment from Dr. Rodman, the opthamologist with whom he had treated, on December 15, 2006, for left-sided head sensations (R. 382), and returned to Dr. Cronin on January 11, 2007, exhibiting sharp pains emanating from the base of his nose through his eyes to the left parietal temple region, daily headaches, decreased short term memory, difficulty with balance, multiple circumscribed fleshy papules around the neck and upper back, a slightly reduced nasal labial fold, and a decreased ability to smile on the right face. (R. 444).

During an examination on February 12, 2007, Dr. Bates noted Plaintiff was

experiencing left-sided facial pain and pressure and blurring of his left eye, showed a "progression" of his symptoms from previous visits, and exhibited no dysphasia. (R. 397-98). Dr. Bates opined Plaintiff's left facial and scalp pain were related to involvement of the first two sensory divisions of his cranial nerve five on the left side, and prescribed 800 milligrams daily of Neurontin (for seizure and nerve pain) to supress his neurogenic pain. (R. 398). A brain MRI on February 12, 2007, by neurologist Laszio Mechtler, M.D. ("Dr. Mechtler"), revealed a thickening of the meninges (membranes) at the base of Plaintiff's skull leading Dr. Mechtler to opine the sarcoidosis had infiltrated Plaintiff's pachymeninges (outer membranes covering the brain and spinal cord). (R. 400).

Plaintiff returned to Dr. Rodman on March 13, 2007, with a "sensation" in his left eye and face, and again on May 15, 2007, with complaints of blurred vision. (R. 478). An examination by neuropsychologist Donna Czarnecki, PhD. ("Dr. Czarnecki") on June 5, 2007, showed Plaintiff exhibiting "relative" weakness of language problems and, that although Plaintiff complained of no new onset of language disturbances, Dr. Czarnecki opined that the language weaknesses associated with Plaintiff's longstanding developmental deficits were "magnified by his brain insult." (R. 517).

A visit to Dr. Bates on June 6, 2007, showed Plaintiff "still [exhibiting] numbness and tingling sensation involving the left face," but experiencing less pain on 600 milligrams of Neurontin. (R. 437). Dr. Bates opined Plaintiff's MRI taken the same day showed a small enhancing lesion (brain tissue damage) of the paramedian pons (area of the brainstem), and noted Plaintiff exhibited no aphasia and recalled three of three test objects at five minutes on a formal memory test. (R. 438). A follow-up examination

with Dr. Bates on August 20, 2007, showed Plaintiff with no aphasia, but exhibiting "fluctuating difficulties with . . . left facial pain somewhat more prominent recently . . . some mild weakness . . . particularly in terms of language function and executive dysfunction [the primary components of executive functioning are inhibition, attention, and working memory; executive functioning controls the ability to identify, plan, and execute a course of action. *United States v. Eff*, 524 F. 3d 712, 715 (5th Cir. 2008)] and some perceptual abnormalities and some difficulty with concentration." (R. 494). Dr. Bates found Plaintiff's

> mentation[9] changes interfere with his usual activities and interfere with his ability to work. He is applying for disability. [She] suspects that his <u>neurosarcoidosis</u> issues from the standpoint of his pulmonary and GI health, <u>and neurologic issues are going to continue.</u> [She] . . . <u>support[s]</u> his <u>attempts to get disability</u> at the present time.

(R. 495)(underlining added).

A September 27, 2007 examination by Dr. Cronin showed Plaintiff with shooting pains in his left scalp and intermittent cramping of his hands and feet, leading Dr. Cronin to conclude that although Plaintiff had improved since his treatment with steroids, Plaintiff was "still not back to baseline." (R. 504).

## DISCUSSION

1. **Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any

---

[9] Any mental activity, including conscious and unconscious processes. *See* Mosby's Medical Dictionary, *available at* http://medical-dictionary.thefreedictionary.com/p/mentation.

> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less
> than 12 months. . . .  An individual shall be determined to be
> under a disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past relevant work, the burden shifts to the Commissioner to prove there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir. 1980).

A.    **Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004) *citing Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

While evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983)

(*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating

physician is supported by medically acceptable techniques and results from frequent

examinations, and the opinion supports the administrative record, the treating

physician's opinion will be given controlling weight. *Scherler v. Sullivan*, 3 F.3d 563, 567

(2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is

supported by substantial evidence. *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§

405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the

Secretary,[10] if supported by substantial evidence, shall be conclusive." *Rutherford v.

Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must

follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520

and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v.

Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the

applicant is engaged in substantial gainful activity during the period of which benefits

are claimed.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant is engaged in

such activity the inquiry ceases and the claimant is not eligible for disability benefits.  *Id.*

The next step is to determine whether the applicant has a severe impairment which

significantly limits the physical or mental ability to do basic work activities as defined in

the applicable regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  Absent an

---

[10] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[11] 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The

---

[11] The applicant must also meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the decision. *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

**B.** **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it includes less responsibility or pay than work previously performed. 20 C.F.R. § 404.1572(a). Earnings may also determine engagement in substantial gainful activity. 20 C.F.R. § 404.1574. In this case, the ALJ concluded Plaintiff did not engage in substantial activity since July 18, 2006, the alleged onset date. (R. 10). Plaintiff does not contest this finding.

**C.** **Severe Physical or Mental Impairment**

The second step of the analysis requires a determination whether Plaintiff has a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, and significantly limits the Plaintiff's ability to do "basic work activities." The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple

instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ found Plaintiff had the severe impairments of post-stroke cognitive disorder and sarcoidosis as defined under 20 C.F.R. § 404.1520(c)(special technique utilized for mental impairments at each level of the administrative review process). (R.10). Plaintiff does not contest this finding.

**D.    Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments"). If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled"). Absent a Listed Impairment, if a claimant alleges an impairment that is not specifically listed in the regulations under the Listing of Impairments, a determination of medical equivalence is required under 20 C.F.R. § 404.1526(b)(2) ("[i]f you have an impairment(s) that is not described in Appendix 1, we will compare your findings with those for closely analogous listed impairments." *See* Social Security Ruling ("SSR") 86-8, 1986 WL 68636, *3 ([w]hen the individual's impairment is not listed, the set for the most closely listed analogous impairment is used). Absent an impairment which meets a listing, and an impairment

that is closely analogous to a Listed Impairment, medical findings of a claimant with a combination of impairments will be compared with medical findings for closely analogous listed impairments. 20 C.F.R. § 404.1526(b)(3). *See* Social Security Ruling ("SSR") 86-8, 1986 WL 68636, *4 ([w]here an individual has a combination of impairments, none of which meets or equals a listed impairment, and each impairment is manifested by a set of symptoms and relevant signs and/or abnormal laboratory findings, the collective medical findings of the combined impairments must be matched to the specific set of symptoms, signs, and laboratory findings of the listed impairment to which they can be most closely related).

Here, the record establishes Plaintiff suffered from a cerebral vascular accident (stroke), for which the relevant Listed Impairment is § 11.04 (central nervous system vascular accident) ("§ 11.04"), as well as from sarcoidosis, which is not separately listed as an impairment in the Listing of Impairments. As such, Plaintiff's stroke must be considered under the relevant Listed Impairment § 11.04 (central nervous system vascular accident) to determine whether it is severe enough to prevent the Plaintiff from performing any gainful activity. If the ALJ does not find Plaintiff's stroke has met the criteria for § 11.04, Plaintiff's sarcoidosis must be considered under the Listed Impairment most closely analogous to sarcoidosis to determine if Plaintiff's sarcoidosis is medically equivalent to such listed impairment. *Threatt v. Astrue*, 2009 WL 1951802, * 10 (D.S.C. 2009) (remand appropriate where ALJ's fails to set forth reasoning for finding claimant's impairments, including sarcoidosis, do not meet or equal any listed impairment). Furthermore, if the ALJ does not find Plaintiff's stroke has met the criteria of §11.04, and Plaintiff's sarcoidosis is not medically equivalent to a closely analogous

Listed Impairment, the collective medical findings of Plaintiff's combined impairments must be matched to a specific set of symptoms, signs, and laboratory findings of the Listed Impairment to which they can be most closely related. 20 C.F.R. § 404.1526(b)(3)("[i]f you have a combination of impairments, no one of which meets a listing . . . we will compare your findings with those for closely analogous listed impairments"). As such, the ALJ was required to analyze whether Plaintiff's medical record established Plaintiff's stroke met the criteria of § 11.04, or whether Plaintiff's sarcoidosis met any closely analogous Listed Impairment, and, if neither Plaintiff's stroke or sarcoidosis met the criteria of a Listed Impairment, whether the combined effects of both impairments are at least of equal medical significance to a Listed Impairment.

In the instant case, the ALJ considered Plaintiff's cerebral vascular accident as an impairment under § 12.05 (mental retardation)(R. 10), rather than under § 11.04 (central nervous system vascular accident). The ALJ opined "[t]he record shows that the claimant had a small stroke in July 2006, but has recovered much of his functioning since then . . . [and] that [Plaintiff] had no significant physical deficits as of twelve months since the alleged onset date." (R. 15). The ALJ confirmed Plaintiff suffered a stroke, but committed error by failing to analyze Plaintiff's impairment under the proper Listed Impairment § 11.04. *McKlusky v. Barnhart*, WL 500809, *6 (N.D. Cal. 2002)(remand where ALJ failed to address claimant's impairment under the correct listing).

Under § 11.04, neurological disorders resulting from a cerebral vascular accident must present with one of the following symptoms more than three months post-vascular

accident: "[s]ensory or motor aphasia resulting in ineffective speech or communication or; . . . [s]ignificant or persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station." 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 11.04. In this case, the record establishes Plaintiff suffered sensory aphasia (problems using or understanding language) more than three months after July 18, 2006, the onset of Plaintiff's cerebral vascular accident. Specifically, on June 5, 2007, Dr. Czarnecki opined Plaintiff demonstrated "relative preservation of visual perceptual/spatial operations, working memory and visual processing speed," yet, exhibited " weaker functioning . . . in areas of verbal operation, [and] executive functioning, as well as perceptual functioning and sustained concentration" leading Dr. Czarnecki to conclude that as "much of [Plaintiff's] language profile is associated with longstanding or developmental deficits. . . [a]ny brain insult . . . may magnify these areas of weakness. . . [and] [t]he only relevant area of weakness was of sustained concentration; if he becomes distracted or is expected to concentrate for a long period of time, his mind may wander and he may not register new information." (R. 517).

Additionally, on August 20, 2007, Dr. Bates diagnosed Plaintiff exhibiting "some mild weakness . . .particularly in terms of language function and executive dysfunction[12] and some perceptual abnormalities and . . . difficulty with concentration," noting Plaintiff's difficulties "may be in part developmental and in part related to his ongoing medical issues including his neurosarcoidosis . . . [that] [h]is mentation changes

---

[12] *See supra* p. 12 citing *United States v. Eff* at 715, executive function includes one's inhibitions, attention and working memory, ability to plan, identify, and execute a course of action.

interfere with his usual activities and interfere with his ability to work . . . [she] support[s] his attempts to get disability. " (R. 494-95)(underlining added). Notably, Dr. Bates opined Plaintiff did not suffer aphasia on October 24, 2006 (R. 406), November 21, 2006 (R. 402), and August 20, 2007 (R. 494).  Whether Plaintiff's language dysfunction constituted ineffective speech and communication under § 11.04 at any time between July 18, 2006 and January 3, 2008, and therefore met the criteria of § 11.04, however, cannot be determined from the record, and was not addressed by the ALJ. As such, the matter should be remanded for further development of the record and a determination of whether Plaintiff's central nervous system vascular accident, particularly manifested by Plaintiff's sensory aphasia, constitutes a severe impairment under 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 11.04.

    If, after reviewing the effects of Plaintiff's stroke on Plaintiff's mentation and executive functioning under § 11.04, the ALJ finds Plaintiff has not met the severity requirement of the listing under § 11.04, because sarcoidosis as diagnosed in Plaintiff is not a listed impairment under the Listing of Impairments, the ALJ should then compare Plaintiff's sarcoidosis symptoms with those of the most closely analogous Listed Impairment to determine whether Plaintiff's sarcoidosis is the "medical equivalent" of the most closely analogous Listed Impairment. 20 C.F.R. §404. 1526(b)(2). *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)(construing the applicability of 20 C.F.R. § 404.1526(b)(2) "if the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing").

     In this case, the record establishes Plaintiff suffers from sarcoidosis or Besnier-

Boeck disease affecting his lungs, brain, eyes, skin, and liver, which the ALJ should have compared to closely analogous listed impairments to determine whether Plaintiff's sarcoidosis was medically equivalent to one most similar Listed Impairment, *i.e.* disorders of the respiratory system § 3.00, liver disease § 5.00(d), impairments that affect multiple bodily systems § 10.00, immune system disorders § 14.00, and organic brain disorders § 12.02. For example, on September 30, 2006, an X-ray revealed "bilateral hilar adenopathy with probable prominent right paratracheal lymph node and pulmonary interstitial prominence in Plaintiff's upper lung fields compatible with pulmonary sarcoidosis." (R. 334). On October 16, 2006, Dr. Cronin opined Plaintiff's sarcoidosis diagnosis was virtually confirmed. (R. 328,391). A liver biopsy performed by Dr. Goodloe on August 22, 2006, showed Plaintiff with multiple non-caseating epitheloid granulomas (ball-like collections of immune cells) consistent with sarcoidosis. (R. 488). On October 6, 2006, Dr. Rodman diagnosed Plaintiff with acute sarcoidosis. (R. 385). On November 21, 2006, Dr. Bates diagnosed Plaintiff with "neurosarcoidosis [sarcoidosis of the central nervous system] manifested by two episodes of 7th nerve palsy." (R. 402)(underlining added). On December 3, 2006, Dr. Corasanti diagnosed Plaintiff with sarcoidosis affecting liver parenchyma, noting Plaintiff's sarcoidosis as the likely etiology of his previously elevated serum transaminase (enzyme that indicates liver damage) levels. (R. 370). Accordingly, on remand, if the ALJ finds Plaintiff's stroke does not satisfy the criteria in § 11.04, the ALJ must determine which listing impairment is most closely analogous to Plaintiff's sarcoidosis as established by the medical record, and analyze Plaintiff's sarcoidosis under such Listed Impairment. If Plaintiff's stroke does not satisfy the criteria in § 11.04, and does not meet whatever Listed Impairment

is most closely analogous to Plaintiff's sarcoidosis, the ALJ must then consider whether the combination of Plaintiff's central nervous system vascular accident and sarcoidosis is the medical equivalent of a listed impairment. 20 C.F.R. § 404.1526(b)(3).

In making these determinations, the ALJ is required to follow the treating physician rule. Medical opinions provided by a claimant's physicians that are supported by medical signs and laboratory findings should be granted more weight than opinions without supporting explanations. 20 C.F.R. § 416.927(d)(3) (the more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings the more weight should be given the opinion) *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Certain factors must be applied when a treating physician's opinion is not given controlling weight including 1) length of the treatment relationship; 2) nature and extent of the treatment relationship; 3) supportability including medical signs and laboratory findings; 4) consistency with the record as a whole; 5) outside factors which tend to support or contradict the treating physician's opinion. 20 C.F.R. § 416.927(d)(1-6). The Second Circuit supports application of the treating physician's rule in social security disability determinations. *Arzuaga v. Bowen*, 833 F2d 424 (2d Cir. 1987).

In this case, the ALJ stated she "accepted the results of the neuropsychological testing as reflective of claimant's limitations." (R. 16). The regulations specify the ALJ "will always give good reasons in [her] notice of determination or decision for the weight [she] [gives] the [claimant's] treating source's opinion." *Halloran v. Barnhart*, F. 3d 28, 32 (2d Cir. 2004) 20 C.F.R. § 416.927(d)(2). Nevertheless, in this case, the ALJ violated the treating physician rule by giving insufficient consideration to the opinion of Dr.

Bates, Plaintiff's treating physician, on the question of whether Plaintiff's sarcoidosis was either closely analogous to a listed impairment, or in combination with Plaintiff's stroke equaled a listed impairment. Specifically, Dr. Bates opined Plaintiff's "mentation changes interfere with his usual activities and interfere with his ability to work . . . [she] suspect[s] his neurosarcoidosis issues form the standpoint of his pulmonary health and GI health, and neurologic issues are going to continue . . . [and] would support his attempts to get disability." (R. 495 ). On remand, the ALJ is required to give this opinion more weight than opinions rendered by non-treating physicians, particularly in light of the fact that Dr. Bates is a specialist. *See* 20 C.F.R. § 404.1527(d)(5)(more weight given to opinion of a specialist about medical issues related to such specialty). As noted, Dr. Tzetzo did not contradict Dr. Bates's diagnosis of sarcoidosis *See* Facts, *supra*, at 10.

Therefore, the matter should be remanded for a new hearing and decision for the period July 18, 2006, through the date of the hearing on January 3, 2008, for a determination of whether the record contains substantial evidence for finding Plaintiff is disabled because (1) Plaintiff's central nervous system vascular accident meets the criteria under § 11.04, or (2) Plaintiff's sarcoidosis meets the criteria of a listed impairment under the medical equivalence rule, or (3) the combination of Plaintiff's impairments, *i.e.* Plaintiff's sarcoidosis and stroke, together are at least the medical equivalence of a listed impairment.  If, upon remand, the ALJ determines that either of Plaintiff's impairments, alone or in combination, meets or is medically equivalent to a listed impairment, then Plaintiff must be awarded disability benefits.  Otherwise, the ALJ must continue to evaluate Plaintiff's impairments with regard to the remaining two steps

of the analysis.

Further, as the matter is before the undersigned for a report and recommendation, should the District Judge disagree with the initial recommendation that the matter should be remanded for a new hearing and decision, the court considers whether the ALJ properly evaluated Plaintiff's disability claim under the remaining two steps of the analysis. In this case, the ALJ next considered whether Plaintiff, despite suffering from central nervous system vascular accident and sarcoidosis which neither met or medically equaled a listed impairment, nevertheless retained the residual functional capacity to perform a wide range of sedentary work.

## E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms. 20 C.F.R. § 416.945(a). If a claimant's residual functional capacity is insufficient to allow the performance of past relevant work, the ALJ must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.960(c). Here, the ALJ found that, because of physical limitations, Plaintiff was unable to perform his past relevant work as machinist, truck driver, house repairer, or school bus driver. (R. 16). Plaintiff does not contest this finding.

However, the ALJ also found Plaintiff possessed skills from his past relevant work that were transferable to other occupations existing the national economy, and possessed the residual functional capacity to perform light work with the following

limitations: (1) simple, routine work ; (2) word recognition at the third grade level; (3) math at the fifth grade level, and (4) spelling at the fourth grade level. (R. 10, 16). The ALJ found Plaintiff's complaints were "not supported to the extent alleged by the treatment notes or his neuropsychological testing," that Plaintiff's testimony supporting the extent of his limitations caused by his stroke and sarcoidosis were not credible or supported by the treatment notes, and concluded, after applying the medical vocational rules, that Plaintiff was not disabled. (R. 15-16). These findings are not supported by substantial evidence in the record because, as discussed, Discussion *supra*, at 21, the ALJ failed to assess Plaintiff's stroke under the relevant section of the Listing of Impairments, *i.e.* § 11.04, or Plaintiff's sarcoidosis under the medical equivalence rule, and the combination of Plaintiff's stroke and sarcoidosis as a combination of impairments, and therefore, failed to assess Plaintiff's exertional and nonexertional residual functional capacity limitations based on all of the evidence in the record. 20 C.F.R. § 404.1529 ("[i]n determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence . . . includ[ing] statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.").

When assessing a claimant's residual functional capacity, the ALJ is required to "consider all of [the claimant's] medically determinable impairments of which [she is]

aware, including [the claimant's] medically determinable impairments that are not

'severe' . . . as explained in §§ 416.920(c)[functioning affected by factors including

mental disorders, structured settings, medication and other treatments], 416.921 [basic

work activities including capacities for understanding, carrying out, and remembering

simple instructions, use of judgment, and dealing with changes in a routine work

setting], and 416.923 [the combined effect of all of Plaintiff's impairments without regard

to whether any impairment if considered separately would be of sufficient severity]" 20

C.F.R. § 416.945(a)(2); 20 C.F.R. § 416.945(e). Here, the ALJ did not consider

Plaintiff's nonexertional limitations, including his memory deficit, lack of concentration,

vertigo, fatigue, mentation, and executive function limitations 20 C.F.R. § 416.969a(c),

*(see* R. 11, R. 38, R. 40, R. 42, R. 368, R. 444), and, mischaracterized the Plaintiff's

abilities to perform daily activities to Plaintiff's disadvantage. *Kohler v. Astrue*, 546 F.3d

260, 268 (2d Cir. 2008)(remand appropriate where ALJ failed to take test result of

claimant's "moderate" level of functioning into account). Specifically, the ALJ described

Plaintiff's daily activity as including

> [a]waken[ing] at six o'clock every morning and prepar[ing] his grand-nephew for
> school. He walks with the child to the bus. From there, he walks one block to the
> local McDonald's and sits for an hour with the retirees. He then performs
> household chores, which includes cooking, vacuuming, washing dishes, and
> sometimes laundry. . . . can walk for approximately ½ to one mile before he
> becomes dizzy and feels lightheaded. . . .cannot bend constantly . . . can kneel
> for approximately one hour . . . could lift and carry ten to twenty pounds with
> either arm . . . could push, pull, reach, stoop and climb stairs without difficulty or
> restriction.

(R. 11).

The ALJ opined Plaintiff's headaches subside with over-the-counter Tylenol and rest,

and that Plaintiff rated his pain as an eight on a scale of one–to-ten. *Id*.

In a letter to the Appeals Council dated March 24, 2008, Plaintiff's wife, F. Renee Bellamy ("Mrs. Bellamy") disputes the ALJ's assessment of Plaintiff's functional limitations.[13] (R. 518-24). Mrs. Bellamy argues Plaintiff: 1) does not awaken at 6:00 am every morning; 2) does not prepare or walk his grand-nephew to school every morning, 3) does not sit at McDonald's for an hour each day; and, 4) there are mornings when he (Plaintiff) cannot get out of bed because he's "hurting so bad," and that Tylenol works for the pain in his head "sometimes" but "the majority of the time he has to lie down." (R. 520). Mrs. Bellamy also stated the Nerontin (gabapentin) Plaintiff takes does not control his VII nerve paresis or left V nerve pain, that Plaintiff suffered significant physical defects since his stroke, and that the record mischaracterizes Plaintiff's fine motor skills because the neuropsychological testing completed a year after his stroke provides no basis for comparison of Plaintiff's fine motor skills prior to his stroke on July 18, 2006. (R. 522).

While an individual's activities must be considered in determining credibility of the complaints (SSR 96-7p), "when a disabled person chooses gamely to endure pain in order to pursue important goals . . .  it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Belsamo v. Chater* 142 F.3d 75, 81 (2d Cir. 1998). Here, uncontroverted medical evidence establishes Plaintiff suffers from fatigue, lack of concentration, vertigo

---

[13] Although not discussed by the ALJ, Mrs. Bellamy's letter is new evidence submitted to the Appeals Council, and becomes part of the administrative record for judicial review. *Brown v. Apfel*, 174 F. 3d 59, 62 (2d Cir. 1999).

and memory deficits. Specifically, on October 5, 2006, Dr. Ryan assessed Plaintiff with a score of "5" on a Hutt-Briskin scoring methodology (exhibiting distortions of angulation, overlap, closure, collision, and motor coordination) where five or more distortions indicates a *"significant organic deficit* in perceptual-motor integrative functioning." (R. 318)(italics added). Dr. Ryan opined Plaintiff can "understand simple directions, perform simple tasks, maintain attention and concentration for probably only short periods of time [but] . . . would have difficulty with a regular schedule, . . . difficulty learning new tasks, [and] . . . may have some difficulty dealing with stress." (R. 318). A neurospychological examination by Dr. Czarnecki on June 5, 2007, showed Plaintiff with considerable difficulty identifying similarities between two common objects or concepts, minor errors of finger localization/identification, and an error of fingertip recognition Dr. Czarnecki described as "serious." (R. 516). The Plaintiff testified he suffers from headaches two to three times a day, experiences decreased short term memory, becomes exhausted after physical activity, and was advised to enter memory therapy but was unable to afford the insurance co-pay. (R. 40-44). It is significant that Plaintiff's consistent, albeit subjective, complaints of pain (R. 397, R. 404, R. 446, R. 494),  have not been questioned or discounted by any of Plaintiff's several treating physicians.

Further, the ALJ's determination that "the record does not show that the claimant has a significant problem with headaches," that Plaintiff's headache complaints were resolved with Tylenol, and that although the Plaintiff complained of many problems upon testing, many of his problems were not confirmed, (R. 16), is not supported by

substantial evidence in the record. Specifically, the record shows Plaintiff visited five different physicians on several occasions with severe head pain, including: 1) three visits to Dr. Cronin on November 13, 2006, January 11, 2007, and September 27, 2007, for "sharp pain on his left face and eye", "sharp head pains every other day", and "left facial pain" (R. 444-46, 483); 2) two visits to Dr. Bates on February 12, 2007, (R. 398), and August 20, 2007, (R. 494) for "radiating and shooting pain localized on the left frontal and periorbital side of his face", and "left facial pain." (R. 397, 494). Although the Plaintiff testified his headaches subside when he takes Tylenol or lays down, Plaintiff testified he also takes gabapentin (anti-seizure and nerve pain medication) for neurogenic headache pain. (R. 41-43). Moreover, the Plaintiff testified he cannot work because of "[t]he headaches I get constantly." (R. 40). As such, the ALJ's conclusions that "the record does not show Plaintiff has a significant problem with headaches" and that "many of [the Plaintiff's] problems were not confirmed" (R. 16), are not supported by, and in fact contradict, substantial evidence in the record.

Although the ALJ is not required to accept these complaints, the ALJ also is not allowed to substitute her own expertise against that of a physician, and remand is warranted where nonexertional limitations are ignored by the ALJ. *Buccheri v. Astrue* 586 F.Supp. 2d 54, 61 (D. Conn. 2008)(remand proper where ALJ does not take nonexertional limitations of fatigue and depression into account under residual functional capacity assessment). Unsupported conclusions regarding the severity of Plaintiff's symptoms requires reasons for the ALJ's decision to reject substantial medical and testimonial evidence in the record regarding the Plaintiff's medically

supported symptoms of pain. *Rashad,* 903 F.3d at 1231*; Rivera v. Schweiker*, 717 F. 2d 719, 723 (2d Cir. 1983)(ALJ's determination claimant's allegations of pain were not credible was erroneous where ALJ placed principal if not sole opinion on observations at hearing).

As such, upon remand, the ALJ should reevaluate the merits of Plaintiff's claim regarding exertional and non exertional limitations consistent with the foregoing.

## F.    Suitable Alternative Employment in the National Economy

The ALJ also concluded Plaintiff was unable to perform his past relevant work as a machinist, truck driver, house repairer, or school bus driver, (R. 16), and determined whether Plaintiff would be qualified or suitable for any position within the national economy. The Second Circuit requires that "all complaints . . . must be considered together in determining . . . work capacity."  *De Leon v. Secretary of Health and Human Services,* 734 F.2d 930, 937 (2d Cir. 1984).  Once an ALJ  finds a plaintiff's impairments prevent a return to previous work, the burden shifts to the Commissioner to prove substantial gainful work exists and that the plaintiff is able to perform in light of her physical capabilities, age, education, experience, and training.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints.  *Gold v. Secretary of Health and Human Services*, 463 F.2d 38, 42 (2d Cir. 1972).  To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other

employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981).

Specifically, the Commissioner must demonstrate by substantial evidence the

applicant's "residual functional capacity" with regard to the applicant's strength and

"exertional capabilities." *Id.* at 294.

An individual's exertional capability refers to the performance of "sedentary,"

"light," "medium," "heavy," and "very heavy" work.[14] *Decker*, 647 F.2d at 294. In

addition, the Commissioner must prove that the claimant's skills are transferrable to the

new employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[15] *Id.*

at 294. This element is particularly important in determining the second prong of the

test, whether suitable employment exists in the national economy. *Id.* at 296.

In this case, the ALJ properly determined Plaintiff could not return to his past

work. (R. 16). The ALJ recognized Plaintiff's "past relevant work exceeds the residual

---

[14]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

[15]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled".  *Decker, supra*, at 295.

   "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).

   "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

capacity he now possesses." *Id*. Plaintiff does not contest this determination.

The Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the Act's medical vocational grids is improper; rather, the plaintiff must be evaluated on an individual basis, and that such evaluation "can be met *only* by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job."  *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (italics added) (reversing district court's decision upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an individual basis, including testimony by a vocational expert, given that the medical-vocational grids do not apply to claimants who are unable to perform the full range of sedentary work).  Furthermore, following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Id*. In the instant case, the ALJ ignored, without basis, the findings of the vocational expert and the Plaintiff's testimony describing his limitations.

At the hearing, vocational specialist expert Peter Manzi ("Mr. Manzi")("the VE") concluded substantial gainful employment opportunities existed that an individual of the same age and education as Plaintiff (who was capable of, at most, light exertion) was capable of performing. (R. 47). These included cafeteria attendant, light, unskilled, with total job titles of 122,855 positions nationally and 575 in the Western New York region; laundry machine sorter, light, unskilled, with 147,134 positions nationally and 540 positions in the Western New York region; cleaner, housekeeping, light, unskilled, with total job titles of 427,633 positions nationally and 2,300 positions in the Western New

York region;  order clerk, sedentary, unskilled, with total job titles of 18,006 positions

nationally and 95 positions in the Western New York region; hand addresser,

sedentary, unskilled, with 24,913 positions nationally and 175 in the Western New York

region. *Id*.  The VE testified the identified positions could be performed with standing for

no more than one hour at a time before change of position, and, alternatively, with fifty

percent sitting and fifty percent standing. *Id*. The ALJ opined "[t]he vocational expert

testified that the claimant could perform the . . .  jobs with the physical limitations that

he testified to at the hearing." (R. 17). This finding is not supported by the evidence in

the record because the ALJ did not include Plaintiff's nonexertional limitations including

fatigue, vertigo, and memory impairment in the hypotheticals posed to the VE, and, as

such, the VE's testimony included no consideration of Plaintiff's nonexertional

limitations including fatigue, vertigo,  memory impairment, mentation, or executive

function deficits. In addition, the ALJ did not consider Plaintiff's treatment visits to Dr.

Ryan on October 5, 2006, Dr. Cronin on January 11, 2007, or Dr. Bates on August 20,

2007, each whom opined that Plaintiff exhibited memory mentation difficulties. Plaintiff's

own testimony regarding his exertional limitations, and the diagnoses of these

physicians as to Plaintiff's limitations were also not taken into account by the ALJ or the

VE . Therefore, in concluding that Plaintiff possessed a residual functional capacity to

work, the ALJ violated the treating physician rule. 20 C.F.R. § 404.1527(c)(1).

As relevant, the record establishes Plaintiff visited Dr. Ryan on October 5, 2006

exhibiting difficulty learning new or complex tasks, little or no ability to maintain

concentration and attention, potential problems dealing with stress, the inability to

maintain a regular schedule, distortions of angulation, overlap, closure collision and

motor coordination, and significant organic deficit in perceptual-motor integrative functioning. (R. 318). After administering a WAIS III test, Dr. Ryan opined Plaintiff exhibited "psychiatric problems which may interfere to some degree on a daily basis." *Id.* On January 11, 2007, Dr. Cronin evaluated Plaintiff as having decreased short term memory and difficulty with balance. (R. 444). Dr. Bates reported on August 20, 2007, Plaintiff exhibited executive dysfunction, perceptual abnormalities, and that Plaintiff's mentation changes interfered with his usual activities and ability to work, concluding she supported his attempts to get disability. (R. 494). Based on a physical examination on September 27, 2007, Dr. Bates opined that although Plaintiff had improved since treatment he was still not back to "baseline." (R. 504). Additionally, the Plaintiff testified he suffered from hand cramping, the inability to stand or walk for short periods, experienced headaches that required rest, and was unable to engage in strenuous activity for a long period of time because he became "exhausted real fast." (R. 35-42).

The record therefore provides substantial evidence Plaintiff exhibited exertional and nonexertional physical limitations that may otherwise erode the residual functional capacity assessment for Plaintiff by the ALJ. Accordingly, the matter should be remanded for a new hearing, including testimony of a VE directed to the combined effects of Plaintiff's central nervous system vascular accident and sarcoidosis and medication side effects on Plaintiff's ability to work, including even light sedentary work.

Mindful that remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial additional delay in processing Plaintiff's disability claim, and the often slow process by which disability determinations are made, the court finds that the remand hearing should also be completed within 90 days of the

issuance of the district court's order accepting this Report and Recommendation. *Butts v. Barnhart*, 388 F. 3d 377, 387 (2d Cir. 2004) (citing *Carroll v. Secretary of Health & Human Services*, 745 F2d, 638, 644 (1983) (a request to expedite disability determination process is proper in remand for claim filed four years earlier).

## CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 12) should be DENIED; Plaintiff's motion (Doc. No. 14) should be DISMISSED without prejudice, and the matter should be REMANDED for an expedited new hearing and decision in accordance with this Report and Recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 30, 2010
                Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      March 30, 2010
                  Buffalo, New York